Martin E. Rosen (108998) mrosen@barwol.com
BARGER & WOLEN LLP
633 West Fifth Street, 47th Floor
Los Angeles, California 90071
Telephone: (213) 680-2800
Facsimile: (213) 614-7399

Attorneys for Defendant
THE LINCOLN NATIONAL LIFE
]INSURANCE COMPANY

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEFFREY CHANDLER, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>THE LINCOLN NATIONAL LIFE INSURANCE COMPANY, a business entity of unknown form; and Does 1 through 25, inclusive,<br><br>Defendants. | CASE NO.: 07-CV-2389-BEN (AJB)<br><br>DEFENDANT THE LINCOLN NATIONAL LIFE INSURANCE COMPANY'S **EARLY NEUTRAL EVALUATION STATEMENT**<br><br>Early Neutral Evaluation Conference: March 11, 2008 |

Defendant The Lincoln National Life Insurance Company files its Early Neutral Evaluation Statement with respect to the Early Neutral Evaluation Conference set for March 11, 2008.[1]

[1] Lincoln National obtained permission from the Court Clerk to file this Statement on March 10, as Plaintiff filed his ENE Statement on March 5, 2008.

## 1. <u>INTRODUCTION</u>

**"What we've got here is [a] failure to communicate."**

Strother Martin, *Cool Hand Luke* (1967)

On the one hand, regrettably, the parties' dispute here stems from a failure to communicate. And to some extent, defendant Lincoln National Life Insurance Company ("Lincoln National") acknowledges that it could have communicated better, and that had it done so, the parties' misunderstanding might not have escalated as it has.

On the other hand, the *<u>only</u>* thing that is at issue here is communication, nothing more. More specifically:

- There is no money due.
- There are no mistaken premium notices.
- There are no errors with respect to calculations concerning the insurance policy at issue.
- There is no breach of contract.
- There is no bad faith.

There simply has been miscommunication. Thus, while plaintiff Jeffrey Chandler ("Chandler") is frustrated, that does not mean that any breach has occurred with respect to the underlying policy, or that he is entitled to any damages.

## 2. <u>THE MECHANICS OF CHANDLER'S POLICY</u>

Chandler purchased Jefferson Pilot Financial policy number 6514454 (the "Policy") in early January 1994. The Policy is a variable flexible premium policy, meaning that the owner can – to *<u>some</u>* extent – decide on the amount of premiums he pays. Obviously, there are limitations on this flexibility: The amount of premium the



BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

owner pays each year must cover the actual mortality cost of the insurance, as well as covering additional expenses associated with the Policy. The remainder of the premium paid by the owner is essentially invested for the owner, so that there will be monies available in later years to assist in paying ongoing premiums.[2]

Common sense dictates that if the owner only pays enough to cover his actual mortality cost, plus expenses – and he does not pay "extra" premium to invest within the policy, and he further withdraws large sums from the value of the policy – then he has *de facto* converted his policy into a "term life" policy,[3] and he will face increasing premium obligations each year.

Suppose an owner with a flexible premium policy pays a large initial premium, thereby providing a pool of money from which later premiums can be paid. If he later "underpays" future premiums, slowly but surely his premiums will be paid from the pool of money he contributed plus any investment gain realized, until either: (i) the money runs out, and there is no longer enough money in the pool to pay for the life insurance expenses, in which case the policy will lapse; (ii) the owner infuses additional monies into the pool, or increases his yearly premium payments; or (iii) the insured dies while the policy is still in force. Of course, the above "underpayment problem" would be exacerbated if an owner not only underfunds his premiums on an ongoing basis, but also affirmatively causes his pool of invested monies to *decrease*, by voluntarily withdrawing some of the monies in the pool.

---

[2] The mortality cost of insuring any person's life increases each year, as a person ages. This simply reflects the fact that a person is more likely to die within the next year the older a person is. However, in a policy such as that purchased by Chandler, the owner typically pays a *fixed* premium. How can one reconcile the increased cost of mortality with a fixed premium? Oversimplifying, the "overpayment" in premiums an owner pays in the early years of his policy ownership are invested, retaining the majority of the value in the policy, and the resulting (hopefully increased) monies are used to help pay the larger mortality expenses incurred in later years.

[3] A term life policy provides pure protection against mortality only. At the end of each term (typically one year), there is no value in the policy, other than the right to pay an additional (higher) premium the next year, for the new term of insurance.

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

*__The above is precisely what has occurred here__*. An initial plan was created by which Chandler would invest large sums of money each year both to fund the current costs of the Policy, and to invest so that later increased mortality charges could be paid for. Specifically, Chandler agreed to a plan in which he would pay $100,000 per year for ten years. While there are maximum cost of insurance guarantees, there were no investment return guarantees. The plan was that these premium payments, when combined with returns on the "excess" portions of the premiums, would be sufficient to continue to fund the cost of insurance for the entirety of Chandler's life.[4]

In fact, although Chandler initially paid $100,000 in premiums, and made premium payments of $125,000, $100,000 and $50,000 in the three years following, he paid in *significantly* less monies in all further years (usually around $15,000 per year) and he even *withdrew* much of the money he had earlier contributed. Not surprisingly, then, after underfunding his Policy after just the first few years, and after then exacerbating the problem by withdrawing even more funds, Chandler eventually received notices from Lincoln Financial that he must increase the amount of premium he was to pay, or the Policy would lapse.

Although an oversimplification, Lincoln National provides below a summary of the basic activity concerning Chandler's Policy, starting with the policy year ending 1996, rounding off numbers to the nearest thousands, and deleting certain minor account activity. As will be noted, the decreasing account values in Chandler's Policy are the result of primarily two factors:

---

[4] As Chandler has always been aware, there were never any guarantees that this plan would provide specific investment returns. Among other things, the owner decides (within the constraints of the options provided in the Policy) how his "excess" monies are to be invested. Several popular options for investing the excess funds provide for investing in equities and bonds, and investment returns in the stock market (and to a lesser extent, in the bond market) are unpredictable. These risks are disclosed to every owner purchasing / investing in this type of life insurance product. In fact, Chandler not only received a product prospectus, but has been receiving semi-annual reports and annual reports each year since the policy was purchased, as well as annual policy statements.

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

- Chandler having paid in much less money from 1999 through 2007, as compared to the amounts he paid in from 1996 through 1998; and
- Chandler having withdrawn considerable sums of money – over $400,000 – in 1999 and 2001.

| POLICY YR ENDING | BEGINNIG BALANCE | AMOUNT PAID IN | COST OF INSURANCE | INVESTMENT GAIN OR LOSS | WITHDRAWALS | ENDING BALANCE [5] |
|---|---|---|---|---|---|---|
| 1996 | $61,000 | $125,000 | -$11,000 | +$25,000 | | $197,000 |
| 1997 | $197,000 | $100,000 | -$12,000 | +$24,000 | | $307,000 |
| 1998 | $307,000 | $50,000 | -$12,000 | +$41,000 | | $384,000 |
| 1999 | $384,000 | $6,000 | -$12,000 | +$41,000 | -$250,000 | $169,000 |
| 2000 | $169,000 | $9,000 | -$13,000 | +$12,000 | | $176,000 |
| 2001 | $176,000 | $15,000 | -$13,000 | - $2,000 | -$159,000 | $16,000 |
| 2002 | $16,000 | $15,000 | -$14,000 | - $2,000 | | $14,000 |
| 2003 | $14,000 | $16,000 | -$15,000 | - $4,000 | | $12,000 |
| 2004 | $12,000 | $15,000 | -$16,000 | + $3,000 | | $13,000 |
| 2005 | $13,000 | $15,000 | -$16,000 | + $1,000 | | $12,000 |
| 2006 | $12,000 | $15,000 | -$18,000 | + $2,000 | | $10,000 |
| 2007 | $10,000 | $15,000 | -$20,000 | + $1,000 | | $ 6,000 |

[5] The "ending balance" for each year is the ending "accumulation balance" for the Policy. This figure does *not* take into consideration any loans which are outstanding. Such loans reduce the amount of money available to the owner, and are reflected in the "surrender value" of the Policy. This is not simply of academic interest. For example, by the end of the policy year ending January 1996, although Chandler's policy shows an ending accumulation balance of $197,000, he had also taken out a loan on the Policy of $140,000, reducing the money actually available to him by a like amount.

Finally, the ending balances in the table for each year do not exactly equal the sum of the numbers in each row for that year due both to my failure to include state premium taxes and annual expense charges, and to my rounding of numbers to the nearest $1,000.

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

Thus, *__nothing nefarious occurred with respect to Chandler's Policy__*. If there was a "problem" with the Policy, it was simply that Chandler elected not to fund the Policy – indeed, he elected to cannibalize it, by withdrawing most of the money he had earlier paid in – but then he still expected that the Policy would provide the intended benefits without such funding.[6]

### 3. __CHANDLER CANNOT AND WILL NOT RECOVER ANY MONIES IN THIS ACTION__

As explained above, the Policy is working exactly as intended. When it is properly funded, it provides a death benefit, both at present, and when mortality charges increase in the future. If it is not properly funded – or if the owner affirmatively depletes the funding and strips the Policy of the monies he had earlier contributed (as Chandler has done) – then not surprisingly the Policy will eventually waste away. That is all that has occurred here. The Policy has properly performed. There is no breach of contract.

Further, because there are no monies owed, and no breach of contract, there can be no bad faith as a matter of law (*e.g., Love v. Fire Insurance Exchange*, 221 Cal. App. 3d 1136, 1151 (1990)[7]), and there is no potential for the recovery of any

---

[6] As Lincoln National has repeatedly emphasized, both in its counsel's numerous prior communications with Chandler's counsel, and in its recent ex parte application to the Court, if Chandler has technical questions with respect to the mechanics of the Policy, or otherwise intends to challenge the specifics of the workings of the Policy, Lincoln National must be given advance notice of the particulars regarding the same, so it may consult with its appropriate technical personnel within the company. Chandler has not provided the specifics of any such purported deficiencies, so Lincoln National will not likely be in a position to discuss the same at the Early Neutral Evaluation Conference.

[7] This principle is well-established in the case law, and not subject to serious dispute. *See, e.g., Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 36 (1995); *Reagen's Vacuum Truck Service, Inc. v. Beaver Ins. Co.*, 31 Cal. App. 4th 375, 389 (1994); *Kopcynski v. Prudential Ins. Co.*, 164 Cal. App. 3d 846, 869 (1985).

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

monies, including attorneys' fees (*see Brandt v. Superior Court*, 37 Cal.3d 813 (1985).

Further still, even if Chandler had a viable bad faith claim – and he does not – attorneys' fees are not recoverable for prosecuting a bad faith claim; they are only recoverable for efforts necessary to obtain *contract* benefits. *Brandt*, *supra*. Since Lincoln National has offered (many times, now) to clarify any questions, issues or concerns that Chandler has with his properly performing Policy, and there are no unpaid contract benefits due, any attorneys' fees that Chandler elects to incur for prosecuting the instant action are non-compensable.

## 4. CONCLUSION

As noted, Chandler is upset at Lincoln National because the company was not as responsive to him as it should have been. Lincoln National apologizes for its poor communication, but emphasizes that that is *all* that has occurred. To the extent that Chandler wishes to pursue the litigation, Lincoln National will of course defend its interests. But Chandler will recover nothing by doing so.

Dated: March 10, 2008

BARGER & WOLEN LLP

By: ____________________
MARTIN E. ROSEN
RUSSELL H. BIRNER
Attorneys for Defendant THE LINCOLN NATIONAL LIFE INSURANCE COMPANY



BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

# PROOF OF SERVICE

***(Jeffrey Chandler v. The Lincoln National Life Insurance Company, USDC, Southern District, Case No.07-CV-2389-BEN( AJB)***

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: Barger & Wolen LLP, 633 West Fifth Street, 47th Floor, Los Angeles, California 90071-2043.

On **March 10, 2008**, I served the foregoing document(s) described as **DEFENDANT THE LINCOLN NATIONAL LIFE INSURANCE COMPANY'S EARLY NEUTRAL EVALUATION STATEMENT,** on the interested parties in this action by placing [ ] the original [X] a true copy thereof enclosed in sealed envelope addressed as stated in the attached mailing list.

Eugene P. Yale, Esq.
David W. Baumgarten, Esq.
YALE & BAUMGARTEN LLP
5030 Camino de la Siesta, Suite 308
San Diego, CA 92108
Telephone #: (619) 220-8790
Facsimile #: (619) 220-0369

[ X ] **BY MAIL**

[ X ] I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ] **(STATE)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed at Los Angeles, California on

[ X ] **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. Executed at Los Angeles, California on **March 10, 2008**.

NAME: Sonia Martinez

(Signature)